NICHOLAS DE ASIO, PETITIONER-APPELLANT, v. CITY OF BAYONNE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, RESPONDENT-RESPONDENT.

Hudson County Court
Law Division

Argued August 7, 1959—Decided December 3, 1959.

*Messrs. Sachs & Sachs,* attorneys for petitioner-appellant (*Mr. Aaron Gordon,* appearing).

*Mr. Frank J. Ziobro,* attorney for respondent-respondent.

REEVES, J. C. C. The Division of Workmen's Compensation, while finding that petitioner was totally and permanently disabled as a result of injuries received by him in an accident arising out of and in the course of his employment, denied an award on the sole ground that the petition had not been filed within time. Petitioner appeals.

This accident occurred on February 12, 1954. The petition was not filed until March 16, 1956, 2 years and 32 days after the happening thereof.

There is little or no substantial dispute as to the material facts involved. Petitioner Nicholas DeAsio, a fireman, then serving as an acting captain in the employ of respondent City of Bayonne, at 8:38 P. M. on the night of February 12, 1954, in sub-freezing weather, attended a fire at Acme Market, 266 Broadway, Bayonne, New Jersey. This fire required a great deal of water to extinguish. Petitioner in the performance of his duties was soaked to the skin, and because of the extreme cold his body and clothing were covered with icicles. In all, he was exposed to the water, the elements and the smoke of a smoldering fire for a period of over two hours during which time he started coughing and spitting up phlegm. On the return trip to his firehouse he developed severe chills and shivering. He participated in the recommissioning of his engine, changed his clothing, and then because of these symptoms went directly to bed.

Petitioner, still on the same shift, remained in bed until 2:09 A. M. of the morning of February 13, 1954, when he responded to another alarm at 9 West 8th Street, Bayonne, New Jersey. Because of his continued coughing, chills and shivering, he was taken from the scene of this fire by a

fellow captain to a nearby restaurant where he was given two or three cups of coffee without beneficial effect. Upon his return to the firehouse from this second fire, because of his condition he again went to bed, covering himself with extra blankets. He remained in bed until his shift was ended at 8:00 A. M. on February 13, 1954.

Petitioner, before leaving for home at 8:00 A. M. on February 13, 1954, made the following notation in the captain's log book with reference to the Acme fire: "Act. Capt. DeAsio very bad wetting at fire," and in the desk journal made the following entry: "Act. Capt. DeAsio very bad wetting."

From February 12, 1954 on, petitioner's health continued to deteriorate. For the next 48 hours, which were normally his two days off, he was confined to his bed at home except for a visit made by him on February 14, 1954 to the office of Dr. Frieman, who continued to treat him until the early part of March 1954. Petitioner returned to work on February 15, 1954 and continued to report for duty until March 11, 1954, but during this period, whether at home or at the fire house, he spent most of his time in bed. When at the firehouse his co-workers regularly massaged him and applied a heat lamp to his body. His illness progressed, with body pains and fever, until on March 11, 1954 he collapsed with severe pains over the upper anterior and right chest wall. On March 15, 1954 he was hospitalized by his then physician, Dr. Grieco, with complaints of pain in the right chest with chills and fever, diagnosis: "Pneumonia right lower lobe." By his own action he discharged himself from the hospital on April 3, 1954, condition: "unimproved," and returned to his home. Petitioner did not respond to treatment at home and was again admitted to the hospital on April 12, 1954, diagnosis: "right empyema." He was discharged on April 21, 1954, condition: "improved." He entered the hospital for the third time on June 7, 1954, diagnosis: "right plural effusion," and remained there until June 9, 1954, when he was discharged, condition:

"improved." The persistence of his affliction was such that he remained away from duty from March 11, 1954 to July 13, 1955, when he was ordered to return to work and was given light duty such as answering the telephone. Petitioner continued performing said light duty for several months, when he suffered a relapse, remaining away from work until February 1, 1957, on which date he was again ordered to return to work, which he did, and was again assigned to light duty. Petitioner was treated by his own physicians, Dr. Frieman, since deceased, and Dr. Grieco, at regular intervals from February 14, 1954 up to and including January 10, 1956.

At the time of the argument of this appeal the attorneys for both parties informed the court that petitioner was again on sick leave, with the same complaints of shortness of breath, pains across the right side of chest, and heavy sweats.

Respondent, in accordance with its established policy, retained petitioner on the municipal payroll at full salary during the periods of his absence from duty.

Respondent, as one of its arguments, resists petitioner's claim for compensation on the ground that it did not obtain knowledge or receive notice of said injury within 90 days after February 12, 1954. *R. S.* 34:15–17. Two forms were provided by respondent for reporting injuries. Form No. 4 was required when any fireman suffered injury. Form No. 5 was required for each individual fire and contained spaces for "injuries to members" and "remarks." It is conceded that petitioner never filed form No. 4 and that he did not fill in the spaces referring to injuries and remarks on the two forms No. 5 that he filed covering the Acme and the 8th Street fires. Petitioner's logical explanation for this failure, that he believed injury meant "that somebody got hurt in arm or head or leg or something," is accepted by this court. However, the argument of respondent with respect to forms No. 4 and No. 5 becomes relatively unimportant in face of the fact that on March 12, 1954 Dr. Louis E. Norwich, a physician employed by the City of Bayonne

in the Department of Public Safety and assigned to the fire department, called at petitioner's home to investigate the cause of his absence from duty and then submitted a report to Peter C. Kenny, Chief of the Bayonne Fire Department, dated March 12, 1954, certifying that petitioner "is suffering from right lobar pneumonia and he is, in my opinion, incapacitated for duty. Expected date of return March 22, 1954."

This court is of the opinion that the entries of a bad wetting made in the captain's log book and in the desk journal at the time of this accident, taken together with the report of Dr. Norwich dated March 12, 1954, certifying that petitioner was suffering from right lobar pneumonia, were sufficient to put respondent on notice of the occurrence of the injury and satisfy the requirements of the statute. *Panchak v. Simmons Co.*, 15 *N. J.* 13 (1954).

Petitioner made application for and received two payments of $50 each from the City of Bayonne Fire Department Relief Fund, Inc., a corporation established by virtue of *R. S.* 43:17–1 *et seq.*, one payment on March 15, 1955 and the other on March 19, 1956. These payments represented maximum benefits allowable in any one year for medical expenses to a fireman of the City of Bayonne, whether or not the same was for service-connected causes to him or for medical expenses for any member of his immediate family.

Petitioner argues that because of these two medical payments made to him by the City of Bayonne Fire Department Relief Fund, Inc., *Reilly v. City of Newark,* 30 *N. J. Super.* 72 (*Cty. Ct.* 1954), and *Lynch v. City of Newark,* 43 *N. J. Super.* 546 (*Cty. Ct.* 1957), affirmed 46 *N. J. Super.* 335 (*App. Div.* 1957), are controlling and therefore dispositive of this appeal. This contention is an oversimplification of the factual situation involved in these cases and for that reason is unsound. These two cases are clearly distinguishable on that point. Both decisions were premised upon an unusual and peculiar arrangement that existed between the City of Newark and the Firemen's Relief Associa-

tion with reference to the treatment and payment of medical expenses of injured firemen. In Newark a fire surgeon was in the employ of both the City and the Firemen's Relief Association, who examined and treated injured firemen, and when necessary referred them to other medical specialists. All medical, hospital and other incidental expenses to effect a cure were by custom paid in full by the Firemen's Relief Association, all to the knowledge of the City of Newark and the members of its fire department. No such arrangement existed between the City of Bayonne and the City of Bayonne Fire Department Relief Fund, Inc., an exact counterpart of the Firemen's Relief Association of the City of Newark. In fact, a directive of respondent prohibited a fire surgeon from examining or treating an ill or injured fireman and, as Dr. Norwich testified, if he had done so, "I would be brought up on charges and I would lose my job." Mere receipt by petitioner of two $50 payments from the Bayonne Fire Department Relief Fund is not sufficient without more to toll the statute of limitations.

However, this court does consider that the following statement contained in the opinion of Judge Foley in the *Lynch* case, including as it does his interpretation of the holding in *Panchak v. Simmons Co., supra,* which interpretation was approved by the Appellate Division, is binding and controlling in the instant matter:

"In my view the *payment* of the medical bills by the Firemen's Relief Association is of no consequence. The question is, who *furnished* the medical treatment? *Cf. Oldfield v. New Jersey Realty Co.*, 1 *N. J.* 63 (1948). The obligation to furnish the treatment was placed upon the city by the statute. And this duty was said in *Panchak v. Simmons Co.*, 15 *N. J.* 13 (1954), to include the burden of ascertaining the need for treatment when circumstances indicating the necessity of it are brought to the employers attention.

Here the need was notorious. Moreover, treatment was undertaken and supervised by the fire surgeon. Knowing, as it is presumed to know, the exigencies of the petitioner's condition and the necessity for treatment at all times, the silence of the city throughout the seven year period of practically continuous medical and surgical care will be considered as constituting authorization for the

petitioner to obtain all treatment which the city was required to furnish in fulfillment of the duty imposed by law.

I regard the silence not as a negative act giving rise to a claim of estoppel, but rather as the affirmative act of giving the petitioner *carte blanche* in the matter. *Cf. Reilly v. City of Newark*, 30 *N. J. Super.* 72 (*Cty. Ct.* 1954). So it is concluded that the petition was filed within two years of the date of the last treatment furnished by the respondent." 43 *N. J. Super.* at *page* 551.

Dr. Norwich, respondent's physician, made regular visitations to petitioner in the line of his official duties, from March 12, 1954 to approximately April 19, 1956. Respondent was therefore familiar at all times with the petitioner's physical condition and his need for medical treatment. In view of the fact that proper notice to respondent has already been determined, respondent's silence and failure to act brings this case within the doctrine of the *Lynch* case, *supra*.

This court is of the opinion that respondent by its actions did authorize petitioner to obtain all treatment which under the facts in this case it was its duty to furnish. The date of the last medical treatment of petitioner was established as January 10, 1956. It is therefore determined that the filing of his petition on March 16, 1956 was within time.

Petitioner's medical expert, a doctor of ample and impressive technical background and experience in education here and abroad, scholarships and hospital affiliations, is an eminent specialist in the field of chest diseases. He had made a thorough examination of the hospital records and all X-rays taken in connection therewith and on September 4, 1956 and December 31, 1956 examined petitioner clinically, fluoroscopically, and by independent X-rays. In addition thereto, he made significant respiratory studies not performed by any other doctor who testified, all of which indicated a grossly diminished lung capacity. He testified that petitioner was suffering from pulmonary insufficiency causally related to the accident of February 12, 1954, so severe in nature that he was totally and permanently disabled. He stated that this condition had continued for a

426

period of three years and was now irreversible and would remain so.

Petitioner's treating physician testified under subpoena on behalf of respondent and refused to express any opinion.

Respondent's medical expert, originally interested in diseases of the chest, was essentially a surgeon. He refused to acknowledge that his opinion as expressed in answer to the hypothetical question was based on the facts assumed therein which caused the deputy director to remark "* * * the answers made by the doctor will be considered in evaluating the weight to be given to the opinion, the opinions expressed." He evaluated petitioner's permanent disability at $7\frac{1}{2}\%$ of total and was of the opinion that same was not causally related to the exposure of February 12, 1954. Suffice it to say that his examination of petitioner's medical background was not thorough nor was his testimony impressive.

Respondent produced two other doctors, again one under subpoena. The doctor under subpoena deemed it not wise to give an opinion because of his cursory examination of petitioner. The other was the hospital radiologist who in disagreement with petitioner's expert contended that an X-ray of July 7, 1955 showed no gross pathology, but did admit that this did not eliminate the possibility of minute pathology.

The determination of this court is that petitioner is totally and permanently disabled as a result of an accident which arose out of and in the course of his employment.

An appropriate order is to be submitted.